Charles E. MEADS, Appellant,

v.

BEST OIL COMPANY d/b/a the Little
Stores, et al., Respondents.

No. A06–966.

Court of Appeals of Minnesota.

Dec. 19, 2006.

Review Denied Feb. 20, 2007.

Charles B. Bateman, Nicole R. Weinand, Reyelts, Leighton, Bateman, Hylden & Sturdevant, Ltd., Duluth, MN, for appellant.

Thomas F. Andrew, Brown, Andrew & Signorelli, P.A., Duluth, MN, for respondents.

Considered and decided by TOUSSAINT, Chief Judge; MINGE, Judge; and HUDSON, Judge.

## O P I N I O N

MINGE, Judge.

Appellant challenges the district court's grant of summary judgment denying his claim against respondents [1] for discriminatory refusal to hire. Appellant asserts the

---

1. Appellant's complaint names both Best Oil and Linda Witta as defendants in the action. But appellant's arguments here are based almost exclusively on Best Oil's hiring decision and Witta's participation in that decision. Appellant does not substantiate a claim against Witta in her individual capacity, and because the issue was not raised by the parties, we do not address whether Witta may be sued in her individual capacity under Minn. Stat. § 363A.08, subd. 2 (2004). Here, for ease of reference, we refer to respondents Best Oil and Witta as respondent, in the singular.

district court erred in determining that (1) there was no genuine issue of material fact whether respondent's justification for not hiring appellant was pretextual; and (2) relief for employment discrimination was barred by respondent's discovery during litigation that appellant failed to disclose a criminal conviction on his employment application. Because we conclude that there is a material fact dispute over whether respondent's justification was pretextual and because discovery during litigation of omissions on an employment application does not bar appellant's employment discrimination claim but may limit his remedies, we reverse.

## FACTS

Respondent Best Oil Company owns and operates a chain of convenience stores in the Duluth area that includes the West End Little Store (Little Store). On October 25, 2004, appellant Charles Meads, an African–American man, applied for a cashier position at the Little Store. There were three applicants for two open cashier positions. The other two applicants, who were Caucasian, were hired instead of appellant.

Before he applied for a job as a cashier at the Little Store, appellant was a regular customer there. He lived across the street and was in the store one or two times a day on average. Appellant asked Aaron Potopinski, a store employee, if the Little Store was hiring. Potopinski told appellant that there was a job opening and that appellant could use him as a reference. Appellant submitted an employment application and included his work history with two references. Appellant later called respondent Linda Witta, the manager of the Little Store, to follow up on his application. Witta scheduled an interview.

Best Oil had no formal criteria for the cashier position and no set interview procedure. Witta, who had recently been appointed manager, conducted most of the Little Store interviews. Witta was given a list of suggested interview questions, but she was not required to follow the list. Witta described her interviews as short, informal, and primarily designed to evaluate the applicant's personality. Witta also stated that she does not rely heavily on an applicant's work history and does not call an applicant's references or former employers.

Both appellant and Witta recall very little about their interview, but the record indicates that appellant performed acceptably. But Witta testified in her deposition that she had worked at the store for several years, that she recognized appellant as a customer from the store, and that based on her prior interaction with appellant, she did not consider him personable.

Cheryl Sievers, who had previously held Witta's position as the manager of the Little Store, was ultimately responsible for making the hiring decision, but made the decision in consultation with Witta. In her deposition, Sievers said that appellant was not hired primarily because of statements by Witta and another employee that appellant was rude while in the store as a customer.

Sievers also testified that appellant's girlfriend, LaVon McEwen, had told Sievers that she (McEwen) was afraid of appellant, and that on one occasion, when they were arguing, McEwen's son stood up for McEwen and appellant struck McEwen's son or attempted to do so. Sievers also said that other employees told her the police had been to appellant's apartment, and that McEwen had come across the street to call 911 due to problems with appellant. McEwen signed an affidavit in which she denied calling police on account of appellant's actions, denied that appellant ever had an altercation with her son, and

denied telling Little Store employees that any such event took place.

Appellant testified at his deposition that he did not have an abusive relationship with McEwen or her son, and that during the time he lived with McEwen, the police were never called to the apartment. Appellant also testified that although he had been in the Little Store many times, he did not remember encountering Sievers, that he could only remember being waited on by or encountering Witta a couple of times, and that their contact was too limited to evaluate his personality. Finally, appellant added that he had gotten along well with store employees, and that Aaron Potopinski had encouraged him to apply for the cashier opening. Potopinski testified in his deposition that he encouraged appellant to apply because, in his experience, appellant was polite, talkative, and personable.

After being turned down for the job and learning that two Caucasian people had been hired, appellant filed a complaint with the City of Duluth Human Rights Office. The human rights office investigated appellant's complaint, found probable cause to believe respondent did not hire appellant due to an unfair discriminatory employment practice, and filed suit on behalf of appellant against respondent, alleging it had engaged in an unfair discriminatory practice in violation of Chapter 29C, Section 7 of the Duluth City Code.

During discovery, respondent learned for the first time that appellant had been convicted in Indiana of aiding in a burglary 12 years earlier. The job application asks each applicant whether he or she has ever been convicted of a crime, other than minor traffic violations. On his application, appellant checked the box labeled "no." The application also states that a prior criminal conviction does not constitute an automatic bar to employment and will be considered as it relates to the job in question. At the bottom of the form, the applicant is asked to certify that the information provided in the application is true, and informs the applicant that if an applicant is employed and the information provided in the application is later found to be false, the applicant may be dismissed. In addition to the employment application warning about false information, respondent's employee handbook provides:

> The Little Stores relies upon the accuracy of information contained in the employment application, as well as the accuracy of other data presented throughout the hiring process and your employment. Any misrepresentations, falsifications, or material omissions in any of this information or data may result in your termination of employment.

In her deposition, Sievers said that a conviction for theft or burglary disqualifies applicants for cashier positions.

Following discovery, respondent brought a motion for summary judgment. The district court concluded that: (1) respondent's evaluation of appellant's personality was a legitimate business justification for not hiring him and that appellant did not establish a material fact dispute over whether this justification was a pretext; and (2) appellant's claim was barred as a matter of law by appellant's materially false job application. The district court granted summary judgment and dismissed appellant's claim. This appeal followed.

**ISSUES**

I. Is there a disputed issue of material fact whether respondent's decision not to hire appellant was based on a legitimate, nondiscriminatory reason or whether the reason was pretextual?

II. Is appellant's employment discrimination action barred by his failure to

disclose a criminal conviction on his employment application, which was discovered after respondent decided not to hire him?

## ANALYSIS

### I. Pretext

The first issue is whether the district court properly granted summary judgment for respondent and found no material fact issue with respect to whether respondent's justification for its hiring decision was pretextual.

When we review a grant of summary judgment, we determine whether there are any genuine issues of material fact and whether the district court erred in its application of the law. *State by Cooper v. French,* 460 N.W.2d 2, 4 (Minn.1990). There is no genuine issue of material fact when " 'the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party.' " *DLH, Inc. v. Russ,* 566 N.W.2d 60, 69 (Minn.1997) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)). When determining whether there are any genuine issues of material fact "the reviewing court must view the evidence in the light most favorable to the party against whom judgment was granted." *Fabio v. Bellomo,* 504 N.W.2d 758, 761 (Minn.1993).

The Duluth City Code prohibits the commission of an unfair discriminatory employment practice. Duluth, Minn., City Code ch. 29C, § 8(a) (2004). The code defines an unfair discriminatory practice by expressly incorporating the definition codified in the Minnesota Human Rights Act (MHRA). Duluth, Minn., City Code ch. 29C, § 7 (2004). Accordingly, we construe the relevant portions of the Duluth City Code to conform with the MHRA and Minnesota caselaw interpreting the MHRA.

The MHRA provides, "[e]xcept when based on a bona fide occupational qualification, it is an unfair employment practice for an employer, because of race ... to (a) refuse to hire ... a person seeking employment." Minn.Stat. § 363A.08, subd. 2 (2004). Under the MHRA, a plaintiff may prove discriminatory intent by direct evidence or by circumstantial evidence in accordance with the three-part *McDonnell Douglas* burden-shifting test. *Hoover v. Norwest Private Mortgage Banking,* 632 N.W.2d 534, 542 (Minn.2001) (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973)). Under the *McDonnell Douglas* test, the plaintiff alleging a discriminatory employment practice must first make out a prima facie case of discrimination. *Id.* To establish a prima facie case, the plaintiff must show that she "(1) is a member of [a] protected class; (2) was qualified for the position [for which she applied]; and (3) was replaced by a non-member of the protected class." *Id.* (quotation omitted). If the plaintiff establishes a prima facie case, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for the hiring decision. *Hoover,* 632 N.W.2d at 542. Once the employer provides a nondiscriminatory reason for its decision, the employee must establish that the proffered reason is a pretext for discrimination. *Id.*

The plaintiff may meet the burden of showing pretext "either directly by persuading the court that a discriminatory reason likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Sigurdson v. Isanti County,* 386 N.W.2d 715, 720 (Minn.1986) (quotation omitted). But "[t]o prove pretext, the em-

ployee must do more than show that the employment action was ill-advised or unwise, but rather must show that the employer has offered a phony excuse." *Henderson v. Ford Motor Co.*, 403 F.3d 1026, 1034 (8th Cir.2005) (quotation marks omitted).

■ The determination of whether the plaintiff has met her burden of showing pretext must be evaluated in light of the nondiscriminatory reason offered by the employer. The purpose of part two of the *McDonnell Douglas* test is not only to rebut the plaintiff's prima facie case of discrimination, but also to "frame the factual issue with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext." *State v. Scientific Computers, Inc.*, 393 N.W.2d 200, 203 (Minn.App.1986) (quotations omitted). Because subjective justifications are based primarily on the decision maker's mental impressions, attitudes, and opinions, an employer's subjective hiring justification makes it especially difficult for a plaintiff to produce evidence to create a material fact issue regarding pretext even if the hiring decision was discriminatory. Moreover, subjective justifications have "the potential to favor applicants who are most like those doing the selecting," and the propensity to conceal discrimination. *Kaster v. Indep. Sch. Dist. No. 625*, 284 N.W.2d 362, 366 (1979). Because the plaintiff's burden to show pretext is more difficult when the employer's justification for its hiring decision is subjective, we consider an employer's lack of objective hiring criteria when determining whether there is a material fact issue in regard to pretext. *Scientific Computers, Inc.*, 393 N.W.2d at 204.

Here, respondent's justification for choosing not to hire appellant was subjective. Respondent's decision not to hire appellant was largely based on Witta's perception that appellant was not personable. She testified that her impression was not based on her interview with appellant, in which appellant performed adequately, but instead was based on one instance in which appellant was allegedly rude to Witta while he was a customer in the Little Store. Whether Witta had a legitimate, nondiscriminatory reason to reach this conclusion and make her decision was disputed. In his deposition, appellant testified he had had little contact with Witta while he was a customer in the store. Also, employee Potopinski had a distinctly different perception of appellant's personality. Potopinski even recommended that appellant apply for the job and offered to serve as a reference for appellant.

In addition to the subjective reason offered by respondent, we note that respondent had an informal hiring process. Its employee handbook indicates that "[p]ersons hired are selected solely on the basis of ... ability, aptitude, experience, education, and desire." However, respondent gave little, if any, weight to an applicant's work history or references, a practice that adds to the subjective nature of respondent's hiring procedure. *Kaster*, 284 N.W.2d at 366. Further, manager Sievers testified that the most important factor in respondent's hiring decisions is the way the interviewer feels about an applicant's personality.

In reaching her decision not to hire appellant, Sievers consulted with Witta. Sievers's participation brought into consideration a disputed domestic-violence incident. Sievers reported that she and other employees had been told of or observed indications of domestic-violence incidents. But appellant denies such allegations. Further, McEwen, the alleged victim of these incidents, submitted an affidavit denying that she ever told Little Store employees she had domestic prob-

lems with appellant, or that appellant had been abusive towards her son. McEwen also denies having ever called the police regarding an incident with appellant. If the Little Store staff was mistaken about such incidents involving appellant, respondent's claim that the incidents were a legitimate business reason for not hiring appellant is in dispute.

■ We do not question that it is important for respondent's convenience store cashiers to be personable, and we recognize the subjectivity inherent in hiring decisions for employment positions that require such skills. But the question before us is not whether these are appropriate considerations or whether respondent met that standard. Rather, the question is whether, on this record, respondent's subjective hiring decision is adequate to support a motion for summary judgment. We do not conclude Witta or Sievers's reason for not hiring appellant was a pretext for racial discrimination. We only conclude that given the factual dispute over the extent of Witta's contact with appellant, employee Potopinski's positive impression of appellant, the dispute over whether Sievers or the employees were mistaken about domestic abuse, the highly subjective nature of the hiring process, the lack of any objective evaluation of appellant's fitness for the position, and our obligation to view the evidence in the light most favorable to appellant, that there is a genuine issue of material fact whether respondent's proffered justification for choosing not to hire appellant was a pretext for racial discrimination. We conclude that summary judgment was error.

## II. After-acquired Evidence

The second issue is whether evidence of appellant's 12–year–old criminal conviction, discovered after respondent decided not to hire appellant, bars his discrimination claim as a matter of law.

Twelve years ago, we addressed the effect of after-acquired evidence of employee wrongdoing on a plaintiff's discrimination claim in *Frey v. Ramsey County Cmty. Human Servs.*, 517 N.W.2d 591 (Minn. App.1994). In *Frey*, the appellant filed a discrimination suit against Ramsey County for discriminatory refusal to renew a contract for emergency foster care services. *Id.* at 594. After the county chose not to renew Frey's contract, the county gained extensive information documenting the extent of Frey's disability. *Id.* at 594–95. This information included medical reports disclosing her psychological inability to handle stress or care for children and a determination of disability by the Social Security Administration. *Id.* at 595. This information confirmed the county's initial conclusion that Frey was incapable of providing emergency shelter care for children at the time she entered into the original contract with Ramsey County. *Id.* at 600–01. After analyzing decisions from other jurisdictions, including conflicting federal circuit court cases, *Frey* held that after-acquired evidence of plaintiff's disability barred her discrimination claim as a matter of law. *Id.*

Although *Frey* announced that as a general rule the act of employee dishonesty in failing to disclose relevant information may bar a claim of discriminatory refusal to hire, *Frey* dealt with a different factual situation than we face here. More importantly, the legal landscape changed shortly after the *Frey* decision. The uncertainty in the federal courts ended the next year when the United States Supreme Court addressed the same issue in *McKennon v. Nashville Banner Publ'g. Co.*, 513 U.S. 352, 115 S.Ct. 879, 130 L.Ed.2d 852 (1995). In *McKennon* a discharged employee sued her employer under the Age Discrimina-

tion in Employment Act (ADEA). *Id.* at 355, 115 S.Ct. at 883. After McKennon was discharged, her employer acquired evidence of misconduct that would have led to McKennon's termination had it been acquired sooner. *Id.* In a unanimous opinion, the Court held that after-acquired evidence of employee wrongdoing does not bar relief for employment discrimination. *Id.* at 357–58, 115 S.Ct. at 883–84.

In *McKennon* the Court began by describing the broad policy of the ADEA: "The ADEA ... is part of an ongoing congressional effort to eradicate discrimination in the workplace [and] reflects a societal condemnation of invidious bias in employment decisions." *Id.* at 357, 115 S.Ct. at 884. As the Court observed, Congress designed the ADEA and Title VII's remedial measures "to serve as a spur or catalyst to cause employers to self-examine and to self-evaluate their employment practices and to endeavor to eliminate, so far as possible, the last vestiges of discrimination." *Id.* at 358, 115 S.Ct. at 884 (quotations omitted). It pointed out that deterrence of discriminatory employment practices and compensation for injuries caused by unlawful discrimination are two primary objects of these statutes. *Id.* The Court reasoned that allowing after-acquired evidence to bar relief for discrimination does not further either objective. Rather, because "[t]he objectives of the ADEA are furthered even when a single employee establishes that an employer has discriminated against him or her," the Court held that after-acquired evidence cannot operate to bar all relief. *Id.*, 115 S.Ct. at 885. The Court also considered whether the equitable rule of unclean hands is available as a defense when there is after-acquired evidence of the employee's wrongdoing and concluded that the rule "has not been applied where Congress authorizes broad equitable relief to serve important national policies." *Id.* at 360, 115 S.Ct. at 885.

Still, the Court recognized that employers have an important interest in, and discretion over, the selection of their workforce. The Court held that an employee's misconduct, while not barring relief, does limit the employee's available remedy. The Court concluded that,

as a general rule in cases of this type, neither reinstatement nor frontpay is an appropriate remedy. It would be both inequitable and pointless to order the reinstatement of someone the employer would have terminated, and will terminate, in any event and upon lawful grounds.

*Id.* at 361–62, 115 S.Ct. at 886.

In *Frey*, we recognized the policy considerations the Court described in *McKennon*, but relied on federal caselaw that has since been superseded to conclude that after-acquired evidence of employee misconduct bars employment-discrimination claims. *Frey*, 517 N.W.2d at 596–99. We do not question the narrow result in *Frey*. On its facts, it is far different from the case before us. *Frey* dealt with emergency foster care for the immediate safety of children and compelling evidence of the immediate inability of a person to provide foster care. *Id.* at 594–95. Here, we are dealing with a 12–year–old conviction and no evidence of a clear and present impact on the employee's ability to do the work. The broad language and analysis in *Frey* is not consistent with our result, but that discussion in *Frey* has been eclipsed by *McKennon*, and we follow *McKennon*. Although *McKennon* is a federal case, it was decided by the United States Supreme Court, and Minnesota courts have regularly construed the MHRA in accordance with Title VII, *Wayne v. MasterShield, Inc.*, 597 N.W.2d 917, 921 (Minn.App.1999), *review denied* (Minn. Oct. 21, 1999), or, if

anything, more favorably to the applicant. *See, e.g., Anderson v. Hunter, Keith, Marshall & Co.*, 417 N.W.2d 619, 625–26 (Minn.1988). Certainly there is an advantage to consistency between the application of state and local government anti-discrimination laws and their federal counterparts. Such consistency minimizes forum shopping and provides a larger body of caselaw to guide employers in planning. Because we accept *McKennon's* rationale, we conclude that evidence of employee wrongdoing, acquired after the employer's hiring or firing decision, does not bar discrimination claims as a matter of law.

■ Consistent with *McKennon*, we recognize that evidence of employee wrongdoing is relevant to the specific remedy ordered under the MHRA. Like Title VII, the MHRA prohibits discriminatory employment practices. *See* Minn.Stat. § 363A.08. But the law "does not constrain employers from exercising significant ... discretion[ ] in the course of the hiring, promoting, and discharging of their employees." *McKennon*, 513 U.S. at 361, 115 S.Ct. at 886. Accordingly, where an employer meets its burden to establish "that the wrongdoing was of such severity that the employee in fact would have been terminated on those grounds alone if the employer had known of it at the time of the discharge," reinstatement and frontpay are not proper remedies. *Id.* at 362–63, 115 S.Ct. at 886–87. However, we do not bar other remedies, including recovery of backpay, which should be calculated "from the date of the unlawful [discriminatory employment practice] to the date the new information was discovered." *Id.* at 362, 115 S.Ct. at 886.

Here, the impact of appellant's burglary record on respondent's employment or termination decision is not free from question. The conviction was 12 years old.

Appellant has held several jobs since then. The conviction was for "aiding" in a burglary. It is not clear what appellant's actual role might have been or how such an older conviction would be considered by respondent in making a decision to not hire or to discharge. *Cf. Green v. Missouri Pac. R.R. Co.*, 523 F.2d 1290, 1295, 1298–99 (8th Cir.1975) (holding that the employer's policy of rejecting applicants with criminal convictions was discriminatory because statistically, black applicants were disqualified at a rate of two and one-half times that of the white applicants and because the employer could not justify the policy as a business necessity). We do not suggest that respondent cannot establish reasonable rules regarding the criminal history of its employees who handle money. We recognize that the employer may reasonably require that an employee be bondable. At the same time, we are aware that employers have been encouraged to give job opportunities to persons with a criminal record. *See* Minnesota Criminal Rehabilitation Act, Minn.Stat. § 364.01 (2004) (stating that employment opportunities are "essential to rehabilitation [of criminal offenders] and the resumption of the responsibilities of citizenship."). We simply note that the nature, extent, and reasonableness of respondent's policy are matters to be determined on remand.

■ Applying *McKennon's* framework here, we conclude the district court erred by holding that after-acquired evidence of appellant's 12–year–old conviction barred appellant's discrimination claim as a matter of law.

## DECISION

We reverse summary judgment dismissing appellant's claim of employment dis-

crimination and remand for trial on whether respondent's refusal to hire was based on a legitimate, nondiscriminatory reason or whether respondent's reason was pretextual and, if the failure to hire was discriminatory, the appropriate remedy. Although appellant's failure to disclose his burglary conviction does not bar his claim, it may affect the range of remedies.

**Reversed and remanded.**